THE FIRST NATIONAL BANK OF McCOOK, McCOOK, NEBRASKA, A CORPORATION, APPELLEE, v. RONALD W. HULL, ALSO KNOWN AS R. W. HULL, ET AL., APPELLANTS.

204 N. W. 2d 90

Filed February 2, 1973. No. 38224.

M. J. Bruckner of Marti, O'Gara, Dalton & Bruckner and Sara Jane Cunningham, for appellants.

Russell, Colfer, Lyons, Wood & Carroll and Cline, Williams, Wright, Johnson & Oldfather, for appellee.

Heard before SPENCER, BOSLAUGH, SMITH, McCOWN, NEWTON, and CLINTON, JJ.

NEWTON, J.

This is a replevin action based on two security agreements. Judgment was entered for plaintiff. Defendant's assignments of error are: (1) That plaintiff was erroneously permitted to amend its petition by substituting a duplicate copy of the security agreement; (2) that parol evidence of an agreement for further credit was wrongfully excluded; and (3) that there was a material alteration of the security agreement. We affirm the judgment of the district court.

The first security agreement was executed in duplicate and a copy retained by each party. The agreement, as signed by the defendant R. W. Hull, provided: "September 3, 1965 R. W. Hull . . ., a resident of #3 Parkview Addition . . . McCook . . . Red Willow . . . Nebraska . . . (hereinafter called 'DEBTOR'), for consideration grants to

Name: FIRST NATIONAL BANK

Office Address: McCOOK, NEBRASKA (hereinafter called 'SECURED PARTY') a security interest in the following property and any and all additions, accessions and substitutions thereto or therefore (herein-

after called the 'COLLATERAL'): All the motor vehicles listed and described on the attached sheet designated Exhibit A, now owned or after acquired

"Mark if applicable [ ] (a) All of Debtor's inventory including all goods, merchandise, raw materials, goods in process, finished goods and all other tangible personal property now owned or hereafter acquired and held for sale or lease or furnished or to be furnished under contracts of service or used or consumed in Debtor's business (all hereinafter called the 'Inventory'), and in contract rights with respect thereto and proceeds of both. Without limitation the term 'Inventory' includes All Petroleum products, tires and other motor vehicle supplies, now owned or after acquired

"Mark if applicable [ X ] (b) All accounts, notes, drafts, chattel paper, acceptances and other forms of obligations and receivables now or hereafter received by or belonging to Debtor for goods sold by it or for services rendered by it, all guaranties and securities therefor, all right, title and interest of Debtor in the merchandise which gave rise thereto including the right of stoppage in transit, and all rights of Debtor earned or yet to be earned under contracts to sell goods or render services and in the proceeds thereof.

"The security interest granted hereby is to secure payment of the indebtedness evidenced by a certain promissory note xxxxx payable to the Secured Party, or order, xxxx together with renewals thereof and such additional sums as may hereafter be advanced to the Debtor or expended by the Secured Party or its assigns on behalf of the Debtor or his assigns for any purpose whatsoever and evidenced by notes, drafts, open account, or otherwise, with interest thereon at rates to be fixed at the time of advancing or expending such additional sums, provided, however, that the making of any such advances or expenditures shall be optional with Secured Party, or its assigns; and this security agreement shall secure the payment of any and all exten-

sions or renewals and successive extensions or renewals of said note or notes, and of any indebtedness at any time owing to Secured Party, or its assigns, and shall further secure the payment of any and all indebtedness owing by Debtor to Secured Party, and for all of which this security agreement shall stand as a continuing security until paid (all of such indebtedness being referred to as the 'Obligations'); and the Debtor agrees that the Secured Party, its successors or assigns, may apply any payments made on the Obligations secured hereby, at its option, on any of the notes or other indebtedness secured hereby."

The security agreement was executed on September 3, 1965. On September 2, 1965, defendant R. W. Hull executed a financing statement which provided: "3. This Financing Statement covers the following indicated types or described items of property as collateral: All Petroleum products, tires and other motor vehicle supplies, and all Accounts, now owned or after acquired."

A similar statement was executed by defendant on September 27, 1968, covering: "All Supplies, equipment, fixtures, machinery, tools, Bulk Storage Tanks and Loading dock and pumps."

Sometime after the execution of the first security agreement the plaintiff inserted an "x" in the box preceding the provision for inclusion of defendant's inventory and also inserted the following in the paragraph specifying the indebtedness covered: "Note for $12,000.00 dated August 12, 1965, and a note for $64,000 dated September 3, 1965, both payable according to the tenor thereof."

Plaintiff was permitted to amend its petition by substituting the defendant's unchanged copy of the security agreement for the bank's copy which had been changed as noted. Defendants insist this cannot be done and cite State Farm Mutual Auto. Ins. Co. v. Drawbaugh, 159 Neb. 149, 65 N. W. 2d 542, which holds that a plaintiff in replevin must prove the title as he pleads it. In

that case ownership of the property in question was alleged when, in fact, plaintiff had only a "special ownership" and the petition was not amended in this regard. In the present case, only a special ownership under the security agreement was ever pleaded and the amendment in no way changed this factor. Possession of the replevined property was obtained under the security agreement. "The general rules governing the amendment of pleadings in civil actions generally, * * *, are applicable to amendments in replevin actions." 46 Am. Jur., Replevin, § 107, p. 60. Of similar import are Pekin Plow Co. v. Wilson, 66 Neb. 115, 92 N. W. 176; Tackaberry & Co. v. Gilmore & Ruhl, 57 Neb. 450, 78 N. W. 32. We conclude that defendant's first assignment is without foundation.

Defendant sought to introduce evidence indicating that plaintiff had agreed to extend further credit to him and failed to do so. This evidence was directly contradictory of the provisions of the written security agreement stating that additional advances "shall be optional with Secured Party." In this respect the security agreement was complete on its face and "Parol evidence is inadmissible to vary a written agreement complete on its face." See Jenkins v. Watson-Wilson Transp. System, Inc., 183 Neb. 634, 163 N. W. 2d 123.

As a defense to this action, defendant relied primarily on the assertion that there had been a material alteration of the security agreement. The first alteration is in regard to specification of the notes representing the indebtedness secured. Defendant does not deny that this was a correct statement of the indebtedness at the time the agreement was executed. Under such circumstances the element of fraud could not be involved and since it is apparent that indebtedness was owing by defendant to plaintiff, the specification of that indebtedness cannot be considered a material alteration.

The second alteration was by insertion of an "x" in the box prefacing the paragraph showing coverage of

the debtor's inventory. At the time of its execution, the security agreement included under this printed paragraph the typewritten statement: "All Petroleum products, tires and other motor vehicle supplies, now owned or after acquired." The fact that this was typed in as a part of this paragraph indicated that the provisions of the paragraph were intended to be applicable. Further evidence of such intention may be found in the provisions of the financing statements covering property generally classified as "inventory." Again the element of fraud is lacking in that the alteration was in line with the apparent intent of the parties as evidenced by these written instruments.

Section 3-115 (1) and (2), Commercial Paper, of the Uniform Commercial Code, provides: "(1) When a paper whose contents at the time of signing show that it is intended to become an instrument is signed while still incomplete in any necessary respect it cannot be enforced until completed, but when it is completed in accordance with authority given it is effective as completed.

"(2) If the completion is unauthorized the rules as to material alteration apply (section 3-407), even though the paper was not delivered by the maker or drawer; but the burden of establishing that any completion is unauthorized is on the party so asserting."

"The filling of blanks in a written instrument is not, strictly speaking, an alteration of the instrument. Where a blank is filled in after the execution and delivery of a written instrument, it is a question of authority to do so. * * *

"The right to fill blanks in written instruments after execution and delivery is based upon an assumption of consent, in the absence of specific instructions, and the leaving of such blanks is considered to imply authority to fill them, and creates an agency in the receiver to do so in the way contemplated by the maker." Mazanec v. Lincoln Bonding & Ins. Co., 169 Neb. 629, 100 N. W. 2d 881. This principle, however, would not apply to

the placing of the "x" in the blank square of a security instrument of the type here involved, where the form is designed to make the paragraph following the square inapplicable if the square is not marked with the "x". We wish to make it clear that in this case the authority to mark the square with the "x" arises from the fact the parties had indicated that that paragraph was to be applicable by causing to be typed therein the material previously referred to.

Section 3-407 (2), Commercial Paper, of the Uniform Commercial Code, provides: "(2) As against any person other than a subsequent holder in due course

"(a) alteration by the holder which is both fraudulent and material discharges any party whose contract is thereby changed unless that party assents or is precluded from asserting the defense:

"(b) no other alteration discharges any party and the instrument may be enforced according to its original tenor, or as to incomplete instruments according to the authority given." Comment 3 b. under this section provides: "There is no discharge where a blank is filled in the honest belief that it is as authorized; * * *."

It will be noted that to void an instrument any alteration must be both material and fraudulent and that an incomplete instrument may be completed in accordance with the intention of the parties. We believe the changes made in the plaintiff's copy of the security agreement were valid under the criteria provided.

Irrespective of the foregoing, there is another ground on which the plea of alteration must be disallowed. As previously mentioned, plaintiff amended its petition so that it is based on the unaltered duplicate copy of the security agreement. "Where an instrument has been executed in duplicate, the unauthorized alteration of one of the copies does not ordinarily affect the validity, operation, or effect of the other copy." 4 Am. Jur. 2d, Alteration of Instruments, § 10, p. 12. See, also, Jones v. Hoard, 59 Ark. 42, 26 S. W. 193; Stine v. Oasis Oil

Co. (Tex. Civ. App.), 290 S. W. 302; Singer v. Murphy, 338 Ill. 620, 170 N. E. 777; Barkley v. Atlantic Coast Realty Co., 170 N. C. 481, 87 S. E. 219; Phillips v. Sipsey Coal Mining Co., 218 Ala. 296, 118 So. 513; Barr v. Ferris, 41 Cal. App. 2d 527, 107 P. 2d 269.

After the amendment of plaintiff's petition to set out the unchanged duplicate of the security instrument executed on September 3, 1965, the property which plaintiff was entitled to recover was limited to that described in this instrument and the security agreement dated September 27, 1968. This comprised all motor vehicles, petroleum products, tires, motor vehicle supplies, all other supplies, equipment, fixtures, machinery, tools, bulk storage tanks, loading dock, pumps, and accounts receivable. If there were any other items taken under the order of replevin, they are to be returned to the defendant.

The judgment of the district court is affirmed as to all items properly taken under the order of replevin, but the court is directed to ascertain if any other items were taken, and, if so, order their return to the defendant and enter judgment for resulting damages, if any. The cross-appeal is disallowed.

AFFIRMED AS MODIFIED AND REMANDED WITH DIRECTIONS.

WHITE, C. J., participating on briefs.

SPENCER, J., dissenting.

I respectfully dissent from the majority opinion herein, which I believe is based upon a misconception of both the facts and the law.

The words "All Petroleum products, tires and other motor vehicle supplies, now owned or after acquired" were typed in by some person at the bank. The examination of that entire section reveals that "All Petroleum products, tires and other motor vehicle supplies, now owned or after acquired," were part of the description of the term "Inventory," contained in that section. The inventory so described was to be pledged only if the

"Mark if applicable" box was actually marked. Someone connected with the bank marked that box, without the defendant's consent, and after the agreement was signed. (Exhibit 23.) Defendant's copy of the security agreement, which is the copy on which the bank is now attempting to rely for its replevin, was not marked in that section. It does not require a legal proposition to show that "All Petroleum products, tires and other motor vehicle supplies, now owned or after acquired," were not pledged unless the pertinent box was marked. A rather simple understanding of basic English seems to make this abundantly clear.

It is obvious that the defendant had a line of credit with the bank and that he fully performed the conditions of the agreement granting the line of credit. Yet the president of the bank, for his own purposes, ignored and violated that agreement. The following questions and answers are from his deposition: " 'Isn't it a fact that he always made his payments in accordance with the $12,000 program?' Answer. 'If you want to go by the record, that's true.' Question: 'According to the record he paid more than that, isn't that a fact?' Answer: 'That's true.' Question: 'Would you kindly tell us why you had enough?' Answer: 'Because he spend (sic) too much money.' Question: 'What do you mean by, spent too much money?' Answer: 'Well, he ran out of money. I wasn't going to loan him any more. That's all there was to it.' Question: 'Well, he ran out of money because you refused to keep your commitment, isn't that right?' Answer: 'I refused to loan him any more money.' Question: 'That's why he ran out of money?' Answer: 'Definitely. I refused to loan him any more money; that's why he ran out of money.' Question: 'Now, why did you refuse to lend him any more money?' Answer: 'Because I didn't want to lend him any more money.' Question: 'You didn't have a good reason?' Answer: 'I had my own reason. Just didn't want to loan him any more money.'

Question: 'What was your reason?' Answer: 'I didn't want to loan him any more money.' Question: 'That's your only reason?' Answer: 'That's my reason.'"

After refusing to honor its commitments to provide defendant with working capital, thus forcing him to close his doors, the bank then took all his security at a time when he was paying down his indebtedness, and then made no effort to satisfy the remaining indebtedness with that security. As of the date of trial, which was almost 1 year after the original taking, all the defendant's property was still sitting in a storage lot and warehouse, depreciating and deteriorating in the elements.

Sections 1-203 and 9-504, Nebraska Uniform Commercial Code, impose on the secured party the responsibility of proceeding in good faith and in a commercially reasonable manner in disposing of the collateral. The plaintiff's actions in this case do not meet either of these requirements. Good faith on the part of the bank has been totally lacking in all phases of the case.

Defendant contends that the alteration of the security agreement of 1965 was material, and it is therefore void. I agree. The majority opinion assumes a consent to unilaterally fill in certain blanks. I disagree. Furthermore, the bank president was not merely filling in blanks when he made the alterations. In addition, he added crossed out words and added others, clearly changing the original intent. This is evidenced by a comparison of the pertinent provisions of the copies of the security agreement of September 3, 1965. Where a party to a written instrument unilaterally fills in certain blanks, changes certain language, and marks as applicable certain paragraphs which at the time of the signing of the agreement were not marked as applicable, the alterations are material, fraudulent, and void the agreement.

The following from the defendant's brief is very pertinent: "This entire case revolves around the ques-

tion of what consideration was offered to Mr. Hull to induce him to make the pledges contained in the security agreements of September 3, 1965, and September 27, 1968. If the only consideration to be offered by the Bank were the notes of $12,000 dated August 12, 1965, and a note for $64,000 dated September 3, 1965, then why were those figures not inserted at the time of the execution of the agreement, and why did the original agreement refer to the 'note' rather than 'notes', and why would a man pledge $80,000 additional collateral for the same consideration that he already had?"

Clearly, the alteration in the present case was material, because it limited the bank's obligation to specific notes of $12,000 and $64,000, and renewals thereof, whereas the unaltered copy did not limit the bank's obligation in any way. Also, at the time of execution the words "of even date herewith" were crossed out, thus evidencing an intention not to limit the bank's obligations to notes executed on September 3, 1965. Nevertheless, in 1967, the bank president unilaterally inserted a note "of even date," i. e., $64,000 note dated September 3, 1965. Furthermore, the altered original caused the defendant Hull to pledge his inventory, which at that time was valued somewhere between 30 and 40 thousand dollars. This was clearly not intended by the defendant when he signed the instrument, nor was it possible for him to pledge his inventory at that time because it was already pledged to Champlin Petroleum Company.

In this case we are aborting our law on material alteration. To allow the plaintiff bank to stand on the defendant's unaltered copy of the security agreement, as the majority opinion does, violates the principle announced in our previous cases. In effect it permits the bank to unilaterally alter the agreement and then, when discovered and exposed, adopt a position which is no worse than the position it was in before it altered the security agreement. It encourages fraud and deceit.

This is evidenced by the fact that until the defendant's unaltered copy was produced when his deposition was taken 11 days prior to the trial, the bank's chief executive officer, who later admitted to altering the agreement, had steadfastly maintained under oath that he had never altered any of the security agreements.

When we adopted the Uniform Commercial Code we armed the banking industry with a sweeping and powerful instrument called the security agreement. To permit the bank, as the majority opinion does, to alter this powerful instrument unilaterally and with impunity, makes a mockery of the long-established sanctity of the written contract, and reduces the individual to a helpless eunuch in his dealings with the banking industry under the Uniform Commercial Code.

There is little question the replevin procedure employed herein is unconstitutional under Fuentes v. Shevin (1972), 407 U. S. 67, 92 S. Ct. 1983, 32 L. Ed. 2d 556. While the defendant is not relying on the unconstitutionality of the statute but rather on the merits of his case, I make this observation to call the Bar's attention to the unconstitutionality of our present replevin statute.

SMITH, J., joins in this dissent.