## CIRCUIT COURT OF FAIRFAX COUNTY

First Union National Bank

v.

Nick D. Turner et al.

July 26, 1995

Case No. (Law) 133736

BY JUDGE ARTHUR B. VIEREGG, JR.

This action was initiated by First Union National Bank of Virginia to recover a judgment against Nick D. Turner and others for nonpayment of a promissory note. During the pendency of the proceedings, First Union reached compromises with all of the defendants except Turner and his wife. Trial without a jury was held on May 10, 1995, after which this Court requested that the parties submit briefs in lieu of final argument. The Court has reviewed the evidence presented and counsels' post-trial briefs and is now prepared to decide this case.

### I. *Overview of the Transactions*

Various agreements between Dominion Bank of Virginia, N.A., Turner, and the other defendants in the case frame this dispute between First Union, Dominion's successor-in-interest,[1] and the Turners.

### A. *The 1989 Note*

On or about November 22, 1989, Dominion made a $360,000.00 loan to Turner, Robert R. Bocek, Clyde G. Hurst, Jr ("Hurst, Jr."), and Clyde G.

---

[1] The Turners moved to strike First Union's case on the grounds that First Union had failed to demonstrate that it was a holder of the 1991 Note. The Court concludes that it need not address that motion in light of the decision announced in this letter.

Hurst, III ("Hurst, III") (collectively, the "Investors") to enable them to buy stock in a new Northern Virginia bank, the Federal Savings Bank. In return for the loan funds, the Investors, as makers, executed a promissory note payable to Dominion ("1989 Note"). The 1989 Note was endorsed by the wives of Turner, Bocek, and Hurst, Jr. (collectively, the "Wives"), as guarantors. The 1989 Note required payment of all the loan principal and any outstanding interest by May 22, 1990. Pl. Ex. 3. Dominion, however, extended the note on several occasions. The last extension delayed the 1989 Note's maturity date to mid-November, 1990.

## B. *The 1991 Note*

The Investors and Wives subsequently executed a second note. This note is dated January 11, 1991; reflects an agreement by the Investors to repay $133,000.00 to Dominion; contains the guaranties of the Wives; and is payable in quarterly principal and interest installments ("1991 Note"). Pursuant to its terms, the last payment became due on December 31, 1993. The 1991 Note was not paid at maturity, and First Union thereafter filed the present action.

## C. *The Dispute Over the 1991 Note*

Although the Turners have advanced various defenses based upon commercial law principles, the Court's decision in this case principally depends upon a resolution of the conflicting testimony advanced by the parties. The Turners contend that late in 1990 they reached an agreement with Dominion pursuant to which they would pay their proportionate share of the 1989 Note obligation, after which they would be released by Dominion from further liability as to that obligation. This agreement in effect separated the obligations of the Investors. The Turners contend a similar arrangement was made between Dominion and the Boceks. To effectuate this agreement, they contend that the Investors executed a new, blank note, which was to extend the Investors' obligations under the 1989 Note so as to enable the Turners and Boceks to arrange for payment of their respective shares of the 1989 Note; that in January, 1991, they paid their share of the 1989 Note; that collateral pledged pursuant to the 1989 Note was returned to them; and that they had no further dealings with Dominion or First Union with regard to the 1989 Note until this action was initiated against them.

Confronted with the 1991 Note bearing their signatures, the Turners further contend that, contrary to the terms of their agreement with Domin-

ion, William Haun, Dominion's loan officer, either fraudulently or negligently caused unauthorized loan terms to be inserted in the blank promissory note they had signed. They contend that the loan principal amount which Haun inserted in the 1991 Note constituted the balance of the 1989 Note *after* payment by the Turners and the Boceks; so that the 1991 Note effectively stipulated that the Turners and the Boceks would remain liable for the remaining indebtedness of the Hursts[2] as expressed in the 1991 Note. According to the Turners, the 1991 Note was to have extended their liability on the 1989 Note only until they paid their separate indebtedness. In light of these circumstances, the Turners finally contend that the 1991 Note was an incomplete instrument within the meaning of Virginia Code § 8.3-115; and that having repaid their share of the 1989 Note in accordance with the agreement reached with Dominion, their liability to Dominion was discharged by operation of Virginia Code § 8.3-407 which governs material alterations of negotiable instruments.[3]

In the face of the Turners' contentions, First Union maintains that the Turners admit that their signatures appear on the 1991 Note; and that the Turners have not sustained their burden of proving that the 1991 Note was signed in blank. First Union additionally maintains that even if the Turners executed the 1991 Note before the loan terms were inserted, they have failed to sustain their burden of proving that the terms were inserted by Dominion or that the terms inserted were unauthorized, i.e., that the terms inserted were different from the agreement reached with the Turners in consideration of their execution of the 1991 Note. Finally, First Union maintains that in order for the Turners to establish that they were discharged from liability under the 1991 Note, they must prove that Haun fraudulently inserted the unauthorized terms in the 1991 Note.

## II. *Summary of the Facts Elicited at Trial*

The following is a summary of the testimony about the negotiation and agreements reached between Dominion and the Investors which culminated in the execution of the 1991 Note.

---

[2] Hurst, III, and his parents, Hurst, Jr., and Addah Jane Hurst, are sometimes collectively referred to herein as the "Hursts."

[3] In separate affirmative defenses, the Turners also allege that if they are liable pursuant to the terms of the 1991 Note, they are liable only as accommodation makers and that as such they were discharged from liability because of First Union's lack of good faith, First Union's release of certain of the other makers without notice to the Turners, and First Union's failure to properly preserve the collateral for the loan.

## A. *Turner's Testimony*

At trial, Turner testified that he had enjoyed a longstanding, informal and congenial relationship with Dominion; that he had experience in banking matters; and that he had signed blank notes extending loans in the past. He further testified that in December, 1990, Haun and he reached an agreement pursuant to which the Investors would execute a short term note extending their 1989 Note obligation to enable the Turners to make arrangements to pay off their share of the 1989 Note.

Turner further testified that thereafter the Turners executed a blank note to be completed by Dominion. He stated that pursuant to his agreement with Haun, the blank note executed would be for approximately $262,000.00 (the amount of a security agreement signed and furnished to the Bank at about the same time); and that the Turners would be discharged from liability under the 1989 and 1991 Notes after his payment. Turner testified that the Turners paid their share of the new note in January, 1991, after which Dominion surrendered all collateral posted by him as security for the 1989 Note; that he never thereafter received a demand to pay the loan; that he never thereafter received notices with regard to the loan interest payment notices or tax information; and that he had no dealings with regard to the loan until he was served with the motion for judgment initiating this action. Turner also testified that he had furnished a financing statement to Dominion upon a request mailed to him but believed the statement was sought in connection with his home equity loan with the bank. Pl. Exs. 28, 35. He testified without contradiction that neither Dominion nor First Union ever questioned his failure to list the Investors' loan as a liability on that statement.

## B. *Haun's Testimony*

Haun was First Union's only witness with regard to the circumstances surrounding the negotiation and execution of the 1991 Note. He testified that when the 1989 Note matured, Dominion advised the Investors that it would not renew the loan and that they should seek refinancing elsewhere. Despite this advice, Dominion extended the loan's maturity date on several occasions from the early summer to the late fall of 1990. Haun testified that after the loan had matured in November, 1990, Turner had approached him and had stated that the Investors had been unable to obtain a purchaser for their stock; and that both Bocek and he wished to pay down the 1989 Note balance. When asked as to the terms of the agreement negotiated with Turner, Haun stated that if the loan was paid

down to $133,000.00, the Bank would release the stock pledged by Turner and Bocek. Haun testified that he advised Turner that the Bank would not release the Turners from liability on the 1989 Note. He testified that this agreement was approved by his superiors and that a note embodying it was prepared in early January, 1991, and later executed by the Investors and Wives. He further testified that he reviewed the 1991 Note before tendering it to the makers and guarantors for signature and that at that time all of the blanks in the note had been filled in. He testified that the note was signed by Turner, Bocek, Hurst, Jr., and Hurst, III, and Mrs. Hurst, Jr., in his presence, although not necessarily at the same time[4]; that he had requested Turner and Bocek to obtain the signatures of their wives as guarantors; and that all of the signatures were obtained by January 11, 1991. He further stated that he had explained the terms of the transaction to each of the Investors when the new note was delivered to them for execution.

Haun further testified that he had not told the makers or guarantors that the 1991 Note was a temporary or a short-term note; nor had he presented a blank note to the Investors and Wives for signature. He stated that customer execution of blank notes would have violated bank policy and his personal practice. Haun further testified that had an extension been necessary, despite the fact that the maturity date of the 1989 Note had passed, bank policy would have permitted an automatic extension of the 1989 Note.[5]

Haun testified that Turner had never asked that Dominion release the Turners from their obligations to the Bank after payment of their share of the 1989 Note and that no releases had been contemplated as part of the 1991 Note transaction. He adamantly denied that he had ever discussed a restructuring of the loan with any of the Hursts, so as to separate the loans of Turner, Bocek, and the Hursts as a consequence of the Office of Thrift

---

[4] During trial, Haun testified that on January 7, 1991, Bocek had appeared at the Bank and had signed the 1991 Note; that he had taken it to his wife to sign that evening; that on January 8, 1991, Turner had appeared at the Bank and had signed the 1991 Note; that he had taken it to his wife to sign that evening; and that Hurst, Jr., his wife, and Hurst, III, had appeared at the Bank to sign the Note on January 11, 1991. During his deposition taken on March 22, 1995, Haun had testified that all of the makers and guarantors had executed the 1991 Note at Dominion's offices on one day.

[5] Significantly, no other former officer of Dominion testified to corroborate Haun's testimony with regard to Dominion's loan extension policies in the 1990 time frame or any other aspect of Haun's testimony.

Supervision ("OTS") requirements related to the Investors' purchase of the Federal Savings Bank.

## C. Bocek's Testimony

Contrary to Haun's testimony that he was unaware of the OTS requirements that the Investors separate their joint obligations, Bocek testified, by deposition, that he had discussed the OTS requirements with Haun; that Haun had indicated he understood the need for the joint indebtedness to be separated; and that Haun and Bocek had agreed that the 1989 Note obligation would be extended in order for the Investors to pay off their shares of the 1989 Note after which they would be released. Bocek stated that thereafter he made arrangements to pay off his share of the Note; that he repaid his share of the 1989 Note obligation; and that he received his collateral. Bocek testified that subsequently he learned from credit reports that Dominion claimed he still was obligated under the 1991 Note. He stated that he brought the matter to Haun's attention, who responded; "No problem, send me a letter." Subsequently, when the present suit was filed, he learned that Haun had not followed through as promised.[6]

## D. The Testimony of Hurst, III

Hurst, III, testified that in connection with the Investors' purchase of the Federal Savings Bank stock, OTS had ordered the Investors to sever their joint obligations. Contrary to Haun's testimony, he stated that he had discussed this requirement with Haun. Hurst, III, further testified that, after discussions with the other Investors, he understood that the Turners would pay off their shares of the 1989 Note balance and that the Boceks eventually elected to do the same thing by borrowing against the equity of their home. Because the Hursts could not afford to pay off their share of the 1989 Note, Hurst, III, testified that he sent a letter to Dominion seeking a loan. Def. Ex. 1. Hurst, III, testified that in late November or early December, 1990, after several months of negotiations, such a refinancing was agreed upon by Haun on behalf of Dominion. He specifically stated that this arrangement had not been negotiated with other Dominion representatives.

Hurst, III, further testified that during the December, 1990, Christmas season, his mother, father, and he arrived at Dominion's offices at Tysons

---

[6] Bocek also vaguely recalled that Haun had delivered a blank note to him for signature by his wife and him.

Corners and executed *two* blank notes.[7] He stated that as he understood it, one of the notes was to bring the overdue 1989 Note current; and the second was a new note to be signed by the Hursts for their outstanding loan balance after the Turners and the Boceks repaid their shares of the 1989 Note. He further stated that at that time, Haun explained the terms of the transaction to his parents and him. Hurst, III, also testified that he executed a security agreement by which he pledged assets to secure the Hursts' $133,000.00 loan, their share of the original obligation reflected in the 1989 Note. He identified a security agreement dated January 11, 1991, securing a loan of $133,000.00 as that which he had signed in December, 1990. Pl. Ex. 7. Thereafter, he received payment slips in order that his parents and he might make periodic payments of loan principal and interest. Hurst, III, in substance, testified that it had always been his understanding of the transaction — negotiated between Haun and himself — that he and his parents alone would be liable for the terms of the 1991 Note, which would then reflect their separate liability remaining from the 1989 Note.[8]

### III. *Analysis and Decision*

#### A. *The Parties' Positions*

The Turners' principal defense in this action is that they agreed with Haun that the 1989 Note obligation would be extended for a short period of time to enable them to pay their share of that obligation; that in return for that agreement and payment of their share of the 1989 Note balance, they would be discharged from further liability to Dominion arising out of Dominion's 1989 loan to the Investors; that to implement the agreement, the Turners executed a blank note to extend the obligation then owed to Dominion; that Dominion was impliedly authorized to insert terms in accordance with the agreement reached with Haun; and that Dominion thereafter inserted unauthorized terms into the blank note reflecting a remaining outstanding principal loan balance after they had paid their share of the loan (and after the Boceks had also paid their share of the loan).

---

[7] Hurst, III, was not asked whether either of the blank notes bore the signatures of either the Boceks or the Turners.

[8] Dominion bank records reflect that on January 16, 1991, the account was transferred from Turners' account number, which it had borne from the inception of the loan, to that of Hurst, III. Pl. Ex. 23.

Based upon ·these facts, which the Turners contend were established by the evidence, they assert that the blank note executed by them to extend the 1989 Note obligation constituted an incomplete instrument within the meaning of Virginia Code § 8.3-115; that Dominion's unauthorized insertion in the blank note of terms which were inconsistent with the agreement reached by Turner and Dominion constituted a material alteration of the note within the meaning of both Virginia Code §§ 8.3-115 and 8.3-407; that this Court is required to enforce the 1991 Note in accordance with the terms agreed upon by Turner and Haun, as required by Virginia Code § 8.3-407(b); and that since the terms of that agreement provided that the Turners would be released upon payment of their share of the 1989 Note indebtedness, they were discharged by their January, 1991, payment.

B. *Analysis of the Applicable Law*

An incomplete instrument is a signed writing, the contents of which show that it was incomplete in any necessary respect at the time of signing. Va. Code § 8.3-115(1).[9] The burden of establishing an unauthorized completion is on the party claiming that the completion was unauthorized. The rules as to material alteration apply to an unauthorized completion of an incomplete instrument. Va. Code §§ 8.3-115(2), 8.3-407(1)(b). There is no Virginia case law directly on point on the issue of whether the party which made an unauthorized completion may enforce the instrument. Although First Union has filed extensive briefs citing a· plethora of case law from other jurisdictions suggesting that the holder of a note may complete that note and that the terms inserted are presumptively authorized, each of these cases also makes clear that if an obligor sustains his burden of proving an unauthorized completion of the instrument, the obligor shall prevail. *See, Milwaukee Petroleum Co. v. Glembin*, 278 N.W.2d 471 (Wis. App. 1979); *Antrim v. McMurrey*, 549 S.W.2d 463 (Tex. App. 1977); *First Nat'l Bank of McCook v. Hull*, 189 Neb. 581, 204 N.W.2d 90 (1973); *Hutcheson v. Herron*, 299 N.E.2d 449 (Ill. App. 1970).

Thus, in *Milwaukee Petroleum Co.*, the Wisconsin appellate court stated:

---

[9] The applicable Code sections, §§ 8.3-115 and 8.3-407, were amended following the transactions in the captioned case. The law as it existed at the time of the transactions governs the resolution of this case, rather than the new Sections 8.3A-115 and 8.3A-407 (Supp. 1991).

> When there are blank spaces in a note when it is signed and the blank spaces are completed to the benefit of the maker and not contrary to any agreement, we hold such completion to be within the implied general authority of the transferee.

278 N.W.2d at 47. And the court noted in a footnote immediately after the words "and not contrary to any agreement," that pursuant to Wisconsin's adoption of the Uniform Commercial Code, completion of an instrument contrary to an express agreement was "sufficient to prove that the completion was unauthorized." *Id.* (citing *Snyder v. Van Doren*, 46 Wis. 602, 1 N.W.2d 285 (1879)). While both Virginia Code § 8.3-115 and the cases cited by First Union demonstrate that the Turners were required to prove by a preponderance of the evidence that an unauthorized completion had been made, these authorities either impliedly or expressly confirm the Turners' material alteration defense. As indicated at the beginning of this opinion letter, the decision of this case therefore depends upon an evaluation of the evidence to determine whether or not the Turners have sustained their burden of proof.

## C. *Application of the Law to the Facts Elicited*

After reviewing the evidence presented, it is clear that the testimony of Haun, First Union's only witness as to the circumstances relevant to the foregoing matters, must be weighed against that of the Investors (all of whom testified except for Hurst, Jr.) and Wives. This Court has done so and concludes that the testimony of the Investors and Wives was generally credible and believable. In contrast, this Court concludes that Haun's testimony was generally unreliable and not credible, not only because it was contradicted by the more persuasive testimony of the Investors and Wives, but also because Haun appeared to this Court to be evasive in the course of his testimony. As a consequence, this Court finds that the Turners have met their burden of proving a material alteration of the 1991 Note. An analysis of the evidence presented from which this Court has found that the Turners sustained their burden of proof follows.

### 1. *The Circumstances Surrounding the 1991 Note*

The parties presented conflicting testimony with regard to the circumstances and agreements reached between the Turners and Dominion giving rise to their execution of the 1991 Note. Haun testified that Turner had initiated negotiations on behalf of the Investors to obtain the release of their collateral pledged to secure the 1989 Note; that Turner, on behalf of

the Investors, and Haun, on behalf of the Bank, had agreed that Turner and Bocek might pay off their pro rata share of the 1989 Note indebtedness and that in return, Dominion would accept a new note for the reduced loan balance of $133,000.00 with a restructured maturity date and terms. Haun further testified unequivocally that prior to the execution of the 1991 Note, he was not aware of the OTS requirements that the Investors sever any joint obligations with one another, including the 1989 Note. He further testified that he had never negotiated with either Bocek or Hurst, III, with regard to the severance of the joint obligation.

Haun's above testimony, however, was contradicted by the testimony of the other Investors, none of whom except Turner had any further interest in this litigation. First, Hurst, III, testified that the OTS severance requirement had caused the Investors to disentangle their 1989 Note obligation to Dominion and that he had written a letter in the early summer of 1990 requesting that Dominion consider a loan to the Hursts to accomplish that severance. He testified further that while the initial letter had been written to another Bank officer, he had negotiated the Hursts' new loan with Haun and had advised Haun that the Turners wished to pay off their portion of the 1989 Loan. Bocek also testified that he had discussed with Haun the need to sever the Investors' joint loan with Dominion on account of the OTS requirements related to the Investors' purchase of the Federal Savings Bank stock.

Furthermore, as Haun admitted during trial, Hurst, III's, June 10, 1990, letter to Dominion was in the Investors' loan file; and he was the loan officer in charge of the Investors' loan. The letter makes clear at least that the OTS had demanded that the interests of the Hursts and the Boceks be severed from that of Turner. Since that demand was made in connection with Federal Savings Bank stock, which represented collateral for Dominion's loan to the Investors, and since Haun was the loan officer with responsibility for that loan, Haun's testimony that he never saw the letter or knew of the OTS severance requirements — even if viewed apart from the testimony of the Investors — raises questions as to its plausibility. For the foregoing reasons, this Court finds that the OTS severance requirements were discussed by the Investors with Haun and were the impetus for the negotiations which culminated in the execution of the 1991 Note. The Court further finds that the restructuring of the 1989 Note obligation arose not in the course of Turner's negotiations with Haun as a representative of the Investors, but rather as a consequence of the requirements of the

Hursts and the Boceks that their obligations be separated from those of the Turners.

Haun's testimony that Turner had agreed that he would pay off the Turners' share of the 1989 Note without being released also lacks credibility. The terms supposedly agreed upon by Haun and Turner would not have achieved the severance of the Turners' indebtedness from that of the Hursts and Boceks. While Haun's testimony might have made sense in the absence of the testimony with regard to the events giving rise to the 1991 Note, the testimony of Hurst, III, and Bocek[10] with regard to the central importance of the OTS requirements make it clear that those requirements were imparted to Haun as the reason for the paydown and restructuring of the 1989 Note. In view of that circumstance, the agreement giving rise to the 1991 Note only made sense *if* Turner, and possibly Bocek, paid off their share of the loan and were released from responsibility with regard to an obligation for which the Hursts were liable.

## 2. *The Completion of the 1991 Note Terms*

Haun's testimony that the 1991 Note was not blank when executed was also contradicted at trial. First, Haun initially suggested that the 1991 Note had been executed in early January, 1991. He further testified that the Investors and Wives had not signed a blank note because it was against Dominion policy and his own banking practices. He further testified that he had explained the transaction to the Investors and Mrs. Hurst, Jr., the necessary implication being that his explanation to them had been consistent with the proposition that the Boceks and the Turners would pay off their share of the 1989 Note obligation but would not be released from liability.[11]

Haun's testimony, that of an interested witness, was contradicted by the testimony of Turner, Bocek, Hurst, III, and Mrs. Hurst, Jr., in varying respects. Both Hurst, III, and his mother testified that they had signed notes to restructure the loan in December, 1990. Turner's testimony with regard to the dates on which his wife and he signed the 1991 Note were consistent with the Hursts' testimony. Furthermore, Hurst, III, Mrs. Hurst,

---

[10] The evidence suggests that Turner, who was not a member of the Federal Savings Bank board of directors, did not know of the OTS requirements.

[11] He did not testify that he was present when Mrs. Bocek and Mrs. Turner signed the 1991 Note, although he gave inconsistent deposition testimony to that effect prior to trial.

Jr., and the Turners all testified they signed a blank note or notes in the transaction to divide the Investors' obligations with respect to the 1989 Note. The Boceks testified equivocally on the point, but on balance, their testimony supported the Turners' assertions that a blank note had been signed. The Court finds that the Turners executed a blank note in December, 1990. Accordingly, the Court finds that the Turners satisfied their burden of proving that they signed an incomplete instrument within the meaning of Virginia Code § 8.3-115(1).

Furthermore, Haun's testimony that the terms agreed upon had always been those set forth in the 1991 Note was similarly contradicted. Not only would the terms testified to by Haun not have satisfied the OTS severance requirements, they were inconsistent with the security agreement signed by the Turners in December, 1990. Def. Ex. 4. That security agreement indicated that the security pledged was to secure a loan of approximately $262,000.00, *not* $133,000.00,[12] the amount of the 1991 Note. As Turner testified, a blank note was signed in order to extend the 1989 Note obligation for a short period of time. The 1989 Note balance *before* the Turners and the Boceks made their payments of their shares of the 1989 Note debt was $262,000.00. The execution of a security agreement for that amount on that date is wholly inconsistent with Haun's testimony as to the agreement reached with the Turners as of that date. Furthermore, the Turner security agreement reflects that the note to be secured was dated November 20, 1990, which is also consistent with Turner's testimony that the purchase of the blank note was to extend the 1989 Note, which had matured in mid-November, 1990, for a short period until Turner had paid off his share of that indebtedness.

The terms which are reflected in the 1991 Note bearing the Turners' signatures contain terms reflecting what the obligations of the Hursts would have been after the Turners and the Boceks had been released. Since Haun concedes that his 1991 Note would have been prepared by Dominion's staff under his direction and since the clear implication of the

---

[12] Hurst, III, testified that he signed a security agreement securing a loan of $133,000.00 dated January 11, 1991. The difference in the amounts of the loans identified in the Turner and Hurst, III, security agreements is probative evidence that Dominion intended to make two loans: one for $262,000.00; a second for $133,000.00. The existence of two loans is consistent with the Investors' testimony that the Investors would sign one $262,000.00 note to extend the 1989 Note obligation until Turner and Bocek could pay off their shares of that obligation in January, 1991, and a second $133,000.00 note to be signed only by the Hursts.

Investors' testimony was that the blank note was returned to Haun after execution, the Court additionally finds that Dominion "completed" the blank note signed by the Investors by inserting the 1991 Note terms.

The 1991 Note terms constituted the Hursts' remaining obligation after the Turners and the Boceks had paid their share of the 1989 Note indebtedness and had severed their obligations from those of the Hursts. These terms differ from the agreement reached between Haun and Turner whereby Turner would be released from liability following payment of his share of the initial debt. Accordingly, this Court finds that the insertion of the 1991 Note terms in the blank note was not authorized by the Turners and constituted a material alteration of the instrument within the meaning of Virginia Code § 8.3-407.

The evidence introduced at trial goes far to suggest that the actions of Haun in causing the material alterations of the blank note signed by the Turners might have constituted intentional, fraudulent conduct. Contrary to the suggestion of First Union, the Turners need not prove intentional fraud to prevail in this suit. Section 8.3-407 provides that if a material alteration is proven, the instrument will be enforced in accordance with the authorization of the parties. In this case, Dominion was authorized to complete the instrument in accordance with the parties' express, albeit oral, agreement. A term of that agreement was that the Turners would be released from liability in the event they paid off their share of the 1989 Note obligation. Since they did so, the 1991 Note may not be enforced against them. Under such circumstances, the Court does not find it necessary to decide the added question of whether the actions of Dominion and its loan officer, Mr. Haun, constituted intentional or constructive fraudulent activity.